# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**JAMES RYAN SINGLETARY,**

      **Plaintiff,**

**v.**                                                                                              **Case No:   6:13-cv-855-Orl-31GJK**

**JEFFREY LUDWIG and JUAN VARGAS,**

      **Defendants.**

## ORDER

This matter is before the Court on Defendants Jeffrey Ludwig and Juan Vargas' Motion for Summary Judgment (Doc. 48), Plaintiff's Response in Opposition (Doc. 81), and Defendants' Reply in Support of the Motion (Doc. 82). There were numerous other filings related to the Motion for Summary Judgment that the Court has considered. (Docs. 49-66, 68-71, 76-80).

The Plaintiff, James Ryan Singletary, was shot in the leg during an attempted police drug sting. Proceeding under 42 U.S.C. §1983, he has sued the officer who shot him, Juan Vargas, and one of Vargas's supervisors with the Brevard County Sheriff's Office ("BCSO"), Jeffrey Ludwig, alleging a violation of the Fourth Amendment's prohibition on the use of excessive force.[1] By way of the instant motion, both Vargas and Ludwig seek summary judgment on the grounds of qualified

---

[1] In his Amended Complaint (Doc. 14), Singletary references the Fourteenth Amendment in addition to the Fourth. However "[a]ll claims that law enforcement officials have used excessive force — deadly or not — in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen are properly analyzed under the Fourth Amendment's 'objective reasonableness' standard, rather than under a substantive due process standard." *Graham v. Connor*, 490 U.S. 386, 388 (1989).

immunity. Ludwig also contends that his involvement was insufficient to establish supervisory liability.

### I. Background[2]

In July 2012, an individual who had been arrested by the BCSO for possession of oxycodone agreed to become an informant. Using contact information provided by the informant, the police via a series of text messages set up a small drug buy for August 4, 2012 at a closed Sunoco station.[3] The police did not know the identity of the seller, only that he or she would be traveling in a red Toyota. Ludwig, who was in charge of the operation, informed the other officers that if the suspects fled in a vehicle, the officers were not to pursue. ((Doc. 51 ("Ludwig Dep.") at 54:16-55:5).

Shortly before the transaction was scheduled to occur, a number of BCSO officers set up in and around the Sunoco station, including Vargas and Lyndale Smith, who were in uniform, and Jason Roberts, who was in plain clothes. Vargas and Smith hid themselves at the station; Roberts, an undercover officer who was to make contact with the seller, remained in view. (Ludwig Dep. 34:17-35:8). Ludwig stationed himself about a quarter mile away, though he remained in communication with the other officers. (*Id.* at 38:21-39:6). Marked police units were also stationed nearby.

At approximately 1:00 a.m., a red Toyota pulled up to the Sunoco station. The car was driven by Nicholas Lechner, who owned the phone number that the police had been texting to arrange the

---

[2] Two security cameras at the gas station where the shooting occurred recorded most of the events during the crucial timeframe of this case. In addition to reviewing the deposition transcripts and other documents in the record, the Court has reviewed the videos from those cameras, which the parties have stipulated to be authentic. (Doc. 48 at 2 n.2).

[3] The BCSO's texts indicated that the purchaser had $100 for the transaction. (Doc. 48-2 at 3 (referencing 100 "bones")).

drug buy.[4] Singletary, his roommate, was in the passenger seat. Singletary subsequently testified that Lechner had invited him along to go to a convenience store to buy cigarettes and that he had no knowledge of any impending drug deal. (Doc. 54 at 57:11-58:25 ("Singletary Dep.")).

As Lechner pulled to a stop at the Sunoco station, Roberts walked up to the passenger side of the car, then was directed to walk around to the driver's side window. As Roberts reached the driver's side window, Ludwig ordered the other officers to converge on the vehicle. Vargas and Smith left the spots where they had been hiding and headed toward the Toyota.[5] (Vargas Dep. at 59:17-61:18). Both came in from the passenger side of the vehicle, with Smith coming in toward the rear while Vargas approached the front wheel. (*See* Security Video from Camera 4;[6] *see also id.* at 63:23-64:9). Vargas was armed with a .223 caliber assault rifle.

As these officers moved toward Singletary's side of the car, Lechner drove forward about one car's length, then stopped. As the car was moving, Singletary looked out his window and put his hands up over his head because, in his words, "I'm not sure if it's the police, I'm not sure if somebody is robbing us, I don't want anything to happen to me." (Singletary Dep. at 75:4-16). He then heard several gunshots, fired in quick succession. (Singletary Dep. at 75:21-76:5). Four bullets, all fired by Vargas, hit the car. One hit the front passenger side pillar, and three hit the passenger door. One of the bullets struck Singletary in the leg, causing a serious injury.

---

[4] The car he was driving was apparently owned by his girlfriend's mother. (Doc. 52 at 35-36).

[5] Vargas testified that he did not immediately leave his covered location on Ludwig's command but instead waited 15-20 seconds to allow the marked cars to arrive on the scene. However Vargas acknowledges that at the time he intercepted the Toyota, those vehicles' blue lights and sirens could not be seen or heard. (Doc. 55 at 62:8-63:22 ("Vargas Dep.")).

[6] The security videos are viewable on the disks submitted to the Court identified as Defendant's Exhibit 1-A (Doc. 48-1) and Plaintiff's Exhibit 5 (Doc. 81-5). Both exhibits contain the video from Camera 4, which shows Smith's and Vargas's approaches to the car.

Singletary testified that he did not hear the police identify themselves or issue any commands before the shooting. (Singletary Dep. at 72:6-73:7). Singletary also stated that he did not see any uniforms before the shots were fired – just a dark figure, rushing from the shadows, carrying an assault rifle. (*See* Doc. 48-6 at 7-8 ("Singletary Statement")).[7]

Lechner also testified that he did not know, at the time, that the individuals surrounding the vehicle were police officers rather than robbers. He stated that, as officers Vargas and Smith approached the car, he did not see their uniforms or hear them identify themselves; he only saw a man with a gun and heard yelling. (*See* Doc. 48-3 at 9-11 ("Lechner Statement")).[8] Lechner said he did not realize that Roberts, Vargas, and Smith were police officers until other officers appeared on the scene with flashlights and marked cars. (*Id.* at 16-17). While Lechner's statement includes contradictory assertions about whether and how much the car moved, he admitted that he did drive forward. When asked why, he responded "Scared. Fear. Just scared. I didn't see anything. I seen a gun. . . . I didn't try to run nobody over. I wasn't trying to run from no fucking cops. I was scared." (*Id.* at 18).

None of the officers have testified that they saw a weapon in the Toyota or saw either passenger make a threatening gesture prior to Vargas opening fire. Vargas contends that he was hit by the Toyota as it lurched forward and that he fired in self-defense. The videos do not provide enough detail to support or contradict Vargas's description of the events,[9] and no other witness can

---

[7] Singletary's first statement was given immediately after the shooting and records a man in pain and medicated. It is not enlightening regarding the issues relevant to the instant motion. The cited document is Singletary's second statement, which was given two days after the shooting.

[8] Lechner's only statements were offered on the same day as the shooting. Subsequently, he invoked his Fifth Amendment right to not testify during deposition. (*See* Doc. 56).

[9] The videos from the two security cameras confirm that Vargas was somewhere near the front passenger side of the car. However, they do not clearly show how close he was or whether he

- 4 -

verify it. Singletary asserts that Vargas was next to the right front wheel (and therefore out of the vehicle's path of travel) when he began firing. (Singletary Statement 48-3 at 9). He also testified that Vargas opened fire after the car had stopped, saying "Nick hit the brakes and the next thing I know -- they were shooting in the car." (Singletary Dep. at 72:7-11).

### II. Standard

#### A. Summary Judgment

A party is entitled to summary judgment when the party can show that there is no genuine issue as to any material fact. Fed. R. Civ. P. 56. Which facts are material depends on the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991).

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the nonmoving party bears the burden of proof at trial, the nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986) (internal quotations and citation omitted). Thereafter, summary judgment is mandated against the nonmoving party who fails to make a showing sufficient to establish a genuine issue of fact for trial. *Id.* at 322, 324-25. The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value").

---

was in the car's path of travel. Further, neither video shows the muzzle flash from Vargas's weapon, and accordingly, the exact timing of the shots cannot be established from the videos.

### B. Excessive Force

The Fourth Amendment provides the right to be "free from the use of excessive force in the course of an investigatory stop or other 'seizure' of the person." *Kesinger ex rel. Estate of Kesinger v. Herrington,* 381 F.3d 1243, 1248 (11th Cir. 2004); *see also* U.S. Const. amend. IV. To establish an excessive force claim, a plaintiff must first show that he was "seized" within the meaning of the Fourth Amendment. *See Vaughan v. Cox,* 343 F.3d 1323, 1328 (11th Cir. 2003). A Fourth Amendment seizure occurs when "there is a governmental termination of freedom of movement through means intentionally applied." *Brower v. County of Inyo,* 489 U.S. 593, 597 (1989).

If that showing is made, the plaintiff must then establish that the force used to effectuate the seizure was unreasonable. *See Brower,* 489 U.S. at 599. "The 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officer's actions are 'objectively reasonable' in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation." *Kesinger,* 381 F.3d at 1248 (citing *Graham v. Connor,* 490 U.S. 386, 397 (1989)). "[T]o determine whether the amount of force used by a police officer was proper, a court must ask whether a reasonable officer would believe that this level of force is necessary in the situation at hand." *Lee v. Ferraro,* 284 F.3d 1188, 1197 (11th Cir. 2002) (internal quotation marks and citations omitted). The inquiry should be viewed from the "perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" and "must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Connor,* 490 U.S. at 396-97.

From the Supreme Court's seminal excessive force case, *Tennessee v. Garner,* 471 U.S. 1 (1985), the Eleventh Circuit has distilled three key factors concerning the reasonableness of the use

of deadly force. *See Vaughan,* 343 F.3d at 1329-30. As set forth by the Eleventh Circuit, an officer may use deadly force to stop a fleeing felony suspect when the officer:

> (1) "has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others" or "that he has committed a crime involving the infliction or threatened infliction of serious physical harm;"
>
> (2) reasonably believes that the use of deadly force was necessary to prevent escape;[10] and
>
> (3) has given some warning about the possible use of deadly force, if feasible.

*Id.* (emphasis removed) (quoting *Garner,* 471 U.S. at 11-12).

Although this list of factors may be relevant in assessing the reasonableness of using deadly force, "in the end we must still slosh our way through the factbound morass of 'reasonableness.'" *Scott v. Harris,* 550 U.S. 372, 383 (2007). What constitutes an "unreasonable" use of deadly force is necessarily fact-specific. *McCullough v. Antolini,* 559 F.3d 1201, 1206 (11th Cir. 2009); *Terrell v. Smith,* 668 F.3d 1244, 1251 (11th Cir. 2012).

Further, in a case such as this, where the passenger of a vehicle is shot while an officer is attempting to stop a car, the Court must look to whether the seizure of the car was reasonable based on the perspective of a reasonable officer. *See Vaughan,* 343 F.3d at 1330[11] (applying reasonability

---

[10] In the context where the threat posed by a fleeing suspect is not the suspect himself (i.e. when the suspect has not harmed someone or threatened harm) but rather the means of flight (such as driving a car dangerously) then the second element in the *Garner* test becomes whether the officer reasonably believed that the use of deadly force was necessary to stop the suspect's means of flight. *See Scott v. Harris*, 550 U.S. 372, 382 n.9 (2007). In other words, the focus is not on preventing the escape, but instead on terminating the threat.

[11] *Vaughan* was abrogated by *Scott v. Harris*, 550 U.S. 372 (2007) as to whether at the summary judgment stage the issue of reasonableness is a question of law. *See Sharp v. Fisher*, 406CV020, 2007 WL 2177123, at *7 n.2 (S.D. Ga. July 26, 2007) *aff'd*, 532 F.3d 1180 (11th Cir. 2008). However, *Scott* did not alter the applicability of *Vaughan* in addressing whether a passenger is seized for purposes of the Fourth Amendment when an officer injures a passenger when using force to stop a vehicle.

analysis to the threat posed by the vehicle when officer shot into truck, hitting passenger, in attempt to stop the vehicle). Accordingly, the Court must assess the government's interest in terminating a plaintiff's flight from a location, considering how it was executed, and balance that against the nature and quality of the officer's intrusion on the plaintiff's Fourth Amendment interests. *See Scott*, 550 U.S. at 384.

### C. Qualified Immunity

Qualified immunity protects government officials performing discretionary functions from individual liability as long as their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Qualified immunity is an immunity from suit rather than a mere defense to liability. *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985). Unless the plaintiff establishes the violation of a clearly established constitutional right, a defendant pleading qualified immunity is entitled to dismissal. *Chesser v. Sparks,* 248 F.3d 1117, 1121 (11th Cir. 2001).

To receive qualified immunity, a government official first must prove that he was acting within his discretionary authority. *Gonzalez v. Reno,* 325 F.3d 1228, 1234 (11th Cir. 2003). Once the defendant establishes this, the burden shifts to the plaintiff to show that qualified immunity is not appropriate. *Id.* The Supreme Court has established a two-part test to determine whether qualified immunity should apply. The court must determine "whether plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer,* 536 U.S. 730, 736 (2002). This requires the court to determine whether the facts alleged, taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a constitutional right. *Gonzalez,* 325 F.3d at 1234. The second prong of the test requires the court to determine whether the right was "clearly established." *Id.* Although it will often be appropriate to consider whether a constitutional violation

has been alleged before assessing whether the right at issue is clearly established, the two determinations may be made in either order. *Pearson v. Callahan,* 555 U.S. 223, 225 (2009) (noting the Court receded from *Saucier v. Katz*, 533 U.S. 194 (2001) rule requiring determination on constitutional issue first then analysis as to whether the right was clearly established).

**III. Analysis**

**A. Qualified Immunity as to Excessive Force Claim Against Vargas**

It is undisputed that Vargas was acting within his discretionary authority as a BCSO deputy sheriff when he shot Singletary. Thus, the question becomes whether Plaintiff has met his burden of showing that Vargas' conduct violated a clearly established constitutional right.

To determine whether it was proper for Vargas to fire four shots into the passenger side of the Toyota, the Court "must ask whether a reasonable officer would believe that this level of force [was] necessary in the situation at hand." *Lee*, 284 F.3d at 1197. From the perspective of an objectively reasonable officer on the scene, and viewing the disputed evidence in a light favorable to Singletary, the answer is no.

At most, the officers believed the men in the Toyota intended to engage in a $100 drug deal; they had no reason to believe that either man had ever committed (or intended to commit) a violent crime. An officer who believed that Lechner was trying to run him over, or that Lechner was trying to escape and by doing so was threatening to hit others with his car, would have been justified in using deadly force to stop the car. *See, e.g., Johnson v. Niehus*, 491 Fed.Appx. 945, 952 (11th Cir. 2012) (stating that Eleventh Circuit has "consistently upheld an officer's use of force and granted qualified immunity in cases where the decedent used or threatened to use his car as a weapon to endanger officers or civilians immediately preceding the officers were in grave danger" and citing cases). But the evidence viewed in the light most favorable to Singletary paints the opposite picture

here. Singletary testified that Vargas was not in the car's path and that it had stopped before he began shooting. Though not dispositive, the location of the bullet holes – in the side of the car, not the front – also supports a conclusion that Vargas was not in danger of being hit by the car when he opened fire. Thus, a reasonable officer would not have had probable cause to believe that either individual in the car posed a threat of serious physical harm, either to the officers or others, or had committed a crime involving the infliction or threatened infliction of serious physical harm. *See Vaughan,* 343 F.3d at 1329-30 (setting forth criteria for use of deadly force).

Moreover, Singletary testified that Lechner stopped the car before Vargas began shooting. Thus, even if a reasonable officer would have believed that deadly force was appropriate to prevent Lechner or Singletary from escaping, there was no longer an escape to prevent by the time shots were fired. *See id.*

Recently, the Eleventh Circuit affirmed the denial of summary judgment in an excessive force case with facts similar to those in the instant case. In *Ayers v. Harrison*, 2:10-CV-32-RWS, 2012 WL 529946 (N.D. Ga. Feb. 17, 2012) *aff'd in part*, 506 F. App'x 883 (11th Cir. 2013).[12] In that case a group of undercover police officers saw Jonathan Ayers give $20 to a known prostitute and drug dealer and then drive away. Sometime thereafter, the officers found themselves in traffic behind Ayers. The officers were in plain clothes and were driving an unmarked Cadillac Escalade.

When Ayers pulled into a gas station, the officers pulled in behind him. Officer Harrison jumped out of the car and then, without identifying himself, drew his gun and approached Ayers' passenger window. Once there, he either waived the gun at Ayers or tapped on the glass while telling Ayers to get out of the car.

---

[12] The appellate court reversed the district court's ruling on a failure to train claim.

According to a statement Ayers made in the hospital after his arrest, when he saw the gun, he thought he was being robbed and tried to escape. He reversed his vehicle around the unmarked police car. As he did so, a second plain-clothed officer, Oxner, jumped into his path. Oxner, who was close enough to slap Ayers' car, had to jump out of the way to avoid being hit.

Harrison followed the vehicle and fired a shot, hitting the passenger side door. Ayers put the car in drive, turning the wheels away from Harrison and toward the roadway. Harrison then fired a second shot, which hit Ayers. Ayers crashed his vehicle and was taken to the hospital, where he died shortly thereafter from the gunshot wound. Ayers' estate filed a Section 1983 claim alleging, inter alia, that Harrison used excessive force. In denying Harrison's motion for summary judgment on qualified immunity grounds, the district court stated:

> At the time Harrison shot and killed Ayers, Harrison had no probable cause to believe that Ayers had committed a crime. Further, Harrison did not announce that he was a police officer, was in plain clothes, and came out of an unmarked Escalade—which had quickly approached—with his gun drawn. In fact, even though the Defendants called a uniformed officer to the scene, Harrison did not wait on him and proceeded to confront Ayers anyway.
>
> Moreover, Harrison elected to confront Ayers in such a fashion even though he had already obtained his vehicle tag number and could have, instead, followed Ayers until the uniformed officer could catch up, or he could have simply waited to question him at his home. Defendants cannot claim the protection of qualified immunity when their own objectively unreasonable actions created the very risk that generated the eventual use of deadly force. Taking the facts most favorable to the Plaintiff, the Court cannot say as a matter of law that a reasonable officer would have shot Ayers.
>
> This analysis does not change because Ayers was trying to flee the scene in a motor vehicle and almost ran over Oxner. First, the Court cannot say that Oxner did not run behind the clear trajectory of the moving vehicle, putting himself in harm's way. Nor can the Court say based upon the video that Ayers even saw Oxner or would have been able to stop to prevent the encounter. But, from the video, it appears that Harrison could have seen Oxner after Oxner hit Ayers' vehicle and before shots were fired. Thus, self-defense of others would have been improper. Moreover, as Plaintiff's expert noted, Ayers' tires were turned away from Harrison when he fired the second fatal shot; Harrison was not in danger. All of this is exacerbated by the fact that Harrison and Oxner continued to pursue Ayers when he was attempting to flee the scene and was not known to be dangerous.

*Ayers*, 2:10-CV-32-RWS, 2012 WL 529946 at *6-7 (citations and quotations omitted).

The parallels to the instant case are obvious. The officers had not seen any weapons in or threatening gestures from the occupants of the vehicle. Although the officers did have probable cause to believe that at least one occupant of the Toyota intended to commit a crime, that crime was a minor, non-violent drug offense -- one for which no pursuit was planned if the suspects fled. And taking Singletary's and Lechner's testimony as true, the officers did not clearly identify themselves or wait for the nearby marked police units to arrive before confronting the suspects.

In reviewing the excessive force claim in *Ayers*, the Eleventh Circuit stated:

> At the time Officer Harrison fired the fatal shot, under the facts most favorable to Plaintiff, neither Officer Harrison nor anyone else present at the scene faced an immediate threat of harm from Ayers, and there was no indication that Ayers posed a danger to others if allowed to drive away.

*Ayers v. Harrison*, 506 F. App'x 883, 884 (11th Cir. 2013). The same holds true here. Under the facts most favorable to Singletary, Vargas was alongside the Toyota when he fired, and the Toyota had stopped. Therefore there was no immediate threat of harm to him or anyone else at the scene.

Under these circumstances an objectively reasonable officer would not have used deadly force by firing through the occupied passenger's compartment of a vehicle which presented no threat to the officer or others. As the *Scott* Court observed, "[i]n determining the reasonableness of the manner in which a seizure is effected we must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Scott v. Harris,* 550 U.S. 372, 383 (2007). Because the car was not being wielded as a deadly weapon, the only governmental interest at play was in apprehending a suspected dealer of small amounts of drugs—so small the officers had been instructed to let the suspects go if they fled. This did not justify Vargas shooting into the car.

The evidence, viewed in the light most favorable to the Plaintiff, establishes that Vargas violated Singletary's Fourth Amendment rights. In addition, it is clearly established that an officer may not use deadly force against the occupants of a car when they pose no danger to the officer or others. *See, e.g., Garner*, 471 U.S. at 11 (1985) ("Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so."). Accordingly, Vargas is not entitled to qualified immunity.

### B. Supervisory Liability Claim Against Ludwig

The claim against Ludwig, on the other hand, cannot stand. While there is a basis to conclude that Vargas's acts present a jury question, the Plaintiff has made no such showing in regard to Ludwig, who was two-tenths of a mile down the road during the events at issue. Under Section 1983, there is no *respondeat superior* or vicarious liability for constitutional violations committed by a subordinate. *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) "Instead, supervisory liability under § 1983 occurs either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation." *Id.* The causal connection can come from: 1) a history of widespread abuse putting the supervisor on notice; 2) a supervisor's custom or policy showing deliberate indifference to a plaintiff's constitutional rights; or 3) when it can be inferred the supervisor directed the subordinate to act unlawfully or knew the subordinate would act unlawfully and failed to stop the subordinate. *Id.*

Plaintiff has failed to meet this standard with regard to Ludwig. Moreover, Plaintiff appears to have abandoned this argument, as it is not addressed in the Plaintiff's Response to the Motion for Summary Judgment. (*See* Doc. 81). Accordingly, Ludwig is entitled to summary judgment. *See Clark v. City of Atlanta, Ga.*, 544 F. App'x 848, 855 (11th Cir. 2013) (affirming district court's

treatment of § 1983 claim as abandoned when plaintiff failed to respond in opposition to the arguments for summary judgment).

In consideration of the foregoing, it is hereby

**ORDERED** that the Motion for Summary Judgment (Doc. 48) is **GRANTED IN PART**. As to Ludwig's request for summary judgment, the motion is **GRANTED**. In all other respects, the motion is **DENIED**.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on September 19, 2014.

_____
**GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE**

Copies furnished to:

Counsel of Record
Unrepresented Party